## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| H.B., | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. |
| v. | : | 1:22-cv-01181-JPB |
| | : | |
| RED ROOF INNS, INC. et al., | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO ALL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants[1] ran the Red Roof Inn in Norcross, Georgia in December 2011 and January 2012. While at the hotel, 16-year-old H.B. was held against her will; viciously choked and physically assaulted; threatened with violence against her and her family by Lucky, a handgun-wielding trafficker; savagely raped and robbed of her virginity; and sold for sex repeatedly—up to 15 times a day. The Red Roof Inn was different than the few other hotels where Lucky trafficked H.B. because (1) the hotel did not bother him when he was selling H.B.; and (2) the hotel staff helped him do it. Hotel staff rented rooms to Lucky several times during this period, despite

---

[1] Red Roof Inns, Inc. ("RRI Inc."); RRI West Management, LLC ("RRI West"); and FMW RRI I, LLC ("FMW RRI").

knowing (or at the very least willfully ignoring) that he was selling the minor H.B. for sex. Front desk and housekeeping staff took money from Lucky to act as lookouts and hide the operation from the police. The hotel's housekeepers also helped Lucky by supplying H.B.'s room with extra towels multiple times a day and discarding the used condoms in the room. The signs of sex trafficking were everywhere. Yet no one at the hotel did anything. H.B.'s unimaginable ordeal ended only because police raided the hotel, rescuing H.B. in the process.

Despite everything that happened to H.B. at the Red Roof Inn, Defendants have moved for summary judgment, asking this Court to absolve them of all civil liability. In their view, there is no evidence that the hotel did anything unlawful. To support this view, however, Defendants construe the facts and inferences therefrom *in their favor*, and they misstate and misconstrue the TVPRA,[2] the federal law enabling sex-trafficking victims such as H.B. to recover civilly from the people and entities that benefited from their trafficking.

To prevail on her TVPRA beneficiary claim,[3] H.B. need only show that Defendants knowingly benefited from participating in a venture that violated the TVPRA as to H.B., and they knew or should have known that the venture violated

---

[2] Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a).

[3] While Plaintiff believes that the pattern and practice of illegal behavior at the highest levels of Red Roof corporate continued to within five years of her lawsuit, she is hereby dropping her claims based on the Georgia RICO Act.

the TVPRA as to H.B. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021). At the very least, H.B. has amassed evidence that creates disputed issues of fact about each element.

*First*, the Red Roof Inn is a venture, and each Defendant was an essential participant in the venture.

*Second*, Defendants knowingly benefited from that venture because they knew they received money from revenue generated by the rental of hotel rooms at the Red Roof Inn.

*Third*, Defendants violated the TVPRA as to H.B. because H.B. was harbored and maintained at the Red Roof Inn, where she was raped and repeatedly sold for sex as a minor over three weeks.

*Fourth*, Defendants knew or should have known about the hotel's TVPRA violation as to H.B. Defendants had constructive knowledge; the signs of H.B.'s sex trafficking were everywhere. Worse, Defendants had actual knowledge of H.B.'s sex trafficking because hotel staff acted as lookouts and kept the room stocked with clean towels and free of used condoms so that H.B. could be sold again and again.

Because H.B. has sufficient proof to create a factual dispute about each element, H.B.'s TVPRA beneficiary claims against Defendants must proceed to trial before a jury. Defendants' summary-judgment motions must therefore be denied.

## I.   STATEMENT OF FACTS[4]

In December 2011, 16-year-old H.B. met a man online who used her love of music to lure her from her home and eventually sold her for sex at the Red Roof Inn.[5] The trafficker, known only by his street name, "Lucky," took H.B. to meet a music group; afterwards, he refused to take her home.[6] Lucky carried a gun and threatened to kill H.B. if she tried to escape.[7] After a few days, he took her to the Red Roof Inn in Norcross, Georgia.[8] Lucky pressured H.B. to have sex for money, saying she owed him for food and drugs while she had been with him.[9] After H.B. refused Lucky's increasingly pressured demands, he violently choked and raped her at the Red Roof Inn—H.B.'s first experience of sexual intercourse.[10] After the rape, Lucky sold H.B. for sex to a man he knew, and H.B. thought she would be able to leave after Lucky was paid.[11] She was wrong.

Over the next three weeks, H.B. was repeatedly sold for sex at the Red Roof

---

[4] To streamline discovery, the parties agreed to share document productions and depositions from prior cases involving Red Roof Defendants and Plaintiff's counsel. Those cases are *Jane Does 1–4 v. Red Roof Inns, Inc.*, No. 1:21-cv-04278-WMR and *W.K. v. Red Roof Inns, Inc.*, No. 1:20-cv-5263-VMC. Deposition cites from those cases say "W.K." Otherwise, the depositions occurred in this case.

[5] Ex. 1, H.B. Dep. 166:21–167:10; 168:5–169:23.

[6] Ex. 1, H.B. Dep. 166:24–169:23.

[7] Ex. 1, H.B. Dep. 210:8–16; 231:19–24.

[8] Ex. 1, H.B. Dep. 167:3–25; 168:17–169:1.

[9] Ex. 1, H.B. Dep. 169:1–12.

[10] Ex. 1, H.B. Dep. 168:22–169:4; 219:10–15.

[11] Ex. 1, H.B. Dep. 234:24–235:6; 235:10–15; 240:7–8.

Inn.[12] Up to 10–15 men per day came to her trafficker's hotel room to purchase the 16-year-old for sex.[13] A man known as "Pizza" and a female named Skii Morris assisted Lucky in trafficking H.B. at the Red Roof Inn, arranging buyers for H.B. and keeping watch over her.[14] At times, H.B. was kept in the same room as Skii, who was being sold for sex to even more buyers.[15] Lucky took H.B. to other hotels for a day or two, but he always returned to the Red Roof Inn "[b]ecause we didn't get bothered at the Red Roof."[16]

Not only did the hotel not bother H.B.'s traffickers, the hotel openly assisted in H.B.'s trafficking.[17] H.B. watched Lucky pay a front desk employee to act as a lookout to make sure the traffickers didn't get in trouble with the police while they sold H.B.[18] Lucky also paid housekeeping employees, or "towel ladies," to serve as lookouts, bring additional towels, and remove the used condoms multiple times per day.[19] The towel ladies saw H.B. in the hallway with Skii and Lucky when they delivered extra towels to her traffickers.[20] The towel ladies acted strangely, like they

---

[12] Ex. 1, H.B. Dep. 270:14–16.
[13] Ex. 1, H.B. Dep. 265:8–10.
[14] Ex. 1, H.B. Dep. 284:24–285:6; 260:4–24.
[15] Ex. 1, H.B. Dep. 260:4–8.
[16] Ex. 1, H.B. Dep. 265:13–16.
[17] Ex. 1, H.B. Dep. 243:4–16; 244:5–15.
[18] Ex. 1, H.B. Dep. 243:4–16; 244:5–15.
[19] Ex. 1, H.B. Dep. 245:21–246:4; Ex. 2, H.B. Decl. ¶ 5.
[20] Ex. 1, H.B. Dep.. 248:3–17.

were afraid of H.B.'s traffickers.[21]

On January 19, 2012, the police conducted a prostitution sting at the Red Roof Inn and found H.B. in a room rented in Skii's name.[22] They rescued H.B.

### A.    Commercial sex was allowed at Defendants' hotel.

Numerous witnesses confirm that commercial sex,[23] including sex trafficking, was rampant at the Red Roof Inn in the years before H.B.'s trafficking there.[24] The hotel had a "heads in beds" policy that meant even if guests were suspected of engaging in commercial sex, the employees should still "sell the rooms."[25] Defendants apparently still have that policy today, and justify allowing commercial sex at their hotels under the erroneous belief that to turn away suspected prostitutes would be discriminatory.[26] Defendants testified, "you don't want to deny a person a room and – just because you think they're a prostitute. That's discrimination."[27] The Red Roof Inn sold condoms in its vending machine.[28] Before H.B.'s trafficking, the hotel's managers and Red Roof corporate were told about the illegal commercial sex

---

[21] Ex. 2, H.B. Decl. ¶ 6.

[22] Ex. 3, Plaintiff H.B. 000151–Plaintiff H.B. 000153.

[23] The TVPRA defines 'commercial sex' broadly as "any sex act on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

[24] Ex. 4, Gilmore Dep.; Ex. 5, Stump Dep.; Ex. 6, Richardson Affidavit; Ex. 7, Doherty Decl.; Ex. 8, Warbington Decl.

[25] Ex. 4, Gilmore Dep. 22:1–7.

[26] Ex. 9, Defendants' 30(b)(6) (Ex.9) 155:6–8.

[27] *Id.*

[28] Ex. 5, Stump Dep. ¶ 10; 31:1–21.

overrunning the property but did nothing in response.[29]

       **i.**       **Commercial sex activity was obvious.**

It was obvious to employees, community members, and police officers that crime and prostitution "were everywhere" at the Red Roof Inn and the surrounding area.[30] Heather Gilmore worked at the Red Roof Inn from 2011–2013 as a night auditor; her hours were 11 p.m. to 7 a.m.[31] She was the only hotel employee on the night shift, yet she had no access to security cameras.[32] Ms. Gilmore grew up in the area and knew its reputation for drugs, prostitution, and "a lot of violence."[33] During her three years at the Red Roof Inn, she rented rooms to people suspected of criminal activity, and she estimated that *half the hotel* rooms were rented for illegal activity.[34] She could recognize prostitutes in the area by the way the women dressed and could tell the guests who were criminal by the way they looked as well, saying "You can tell someone who's professional, they carry themselves differently than someone who, say, sells drugs or prostitutes. They just carry themselves differently."[35] These guests "mostly" liked to be placed on the back side of the hotel.[36] At least once, Ms.

---

[29] Ex. 8, Warbington Decl. ¶¶ 5; 10.
[30] Ex. 10, Gilmore Aff. ¶¶ 5, 9.
[31] Ex. 4, Gilmore Dep. 17:17–25.
[32] Ex. 4, Gilmore Dep. 26:5–23.
[33] Ex. 4, Gilmore Dep. 19:5–22; 86:6–13.
[34] Ex. 4, Gilmore Dep. 20:22–21:7; 21:9–19; 28:2–7.
[35] Ex. 4, Gilmore Dep. 87:8–14; 88:8–89:7.
[36] Ex. 4, Gilmore Dep. 21:21–24.

Gilmore witnessed a man and woman checking in where the woman couldn't speak for herself while the man used her identification to rent the room.[37]

John Stump, a security guard employed by G4S Security, worked at the Red Roof Inn on Friday and Saturday nights from 2010–2013.[38] It was obvious to him that crime and prostitution were "everywhere" at the hotel and the surrounding area.[39] Once, Mr. Stump overheard a prostitute making a deal with a man for a date and posted about it on Facebook.[40] Mr. Stump saw a lot of commercial sex activity at the hotel, explaining "we would see doors that—the only way I could refer to them is almost like they were like revolving doors. You could see a person go in; they[] would be there 30, 20 minutes. They'd leave. Another person would show up. 20, 30 minutes; they'd leave; another person would show up. And it was a constant just flow of people going in."[41] These visitors—mostly men—were not hotel guests.[42] Mr. Stump saw this activity nearly every weekend.[43] Mr. Stump also saw men escort women to rooms, loiter in the hallways, and park to hide their license plate.[44]

From 2006–2016, Chuck Warbington was the executive director of the

---

[37] Ex. 4, Gilmore Dep. 103:7–104:24.
[38] Ex. 11, Stump Aff. ¶¶ 3, 4.
[39] Ex. 11, Stump Aff. ¶ 13.
[40] Ex. 11, Stump Aff. ¶ 9.
[41] Ex. 5, Stump Dep. 17:24–18:9.
[42] Ex. 5, Stump Dep. 18:10–19.
[43] Ex. 5, Stump Dep. 19:1–8.
[44] Ex. 5, Stump Dep. 26:2–9; 29:12–20.

Gwinnett Village Community Improvement District, which encompassed the Red Roof Inn.[45] Mr. Warbington found the commercial sex trade at the Red Roof Inn so rampant that it was obvious and apparent to anyone at the hotel; he saw young girls soliciting sex and was solicited himself while driving through the property.[46] Based on his firsthand observations, Mr. Warbington concluded that the hotel

> appeared to involve a sophisticated network that protected the commercial sex trade, meaning that there were people other than the girls being sold for sex involved in keeping the commercial sex operations at the hotel running in a way that avoided the police. It appeared that someone at the hotel was giving warnings to those engaged in the sex trade when the police were coming to the property. When I drove through the hotel, I observed people who appeared to be watching or were looking out for the police at the Red Roof Inn.[47]

The police were also well aware of the Red Roof Inn's association with illegal commercial sex. Gwinnett County Police Officer Jon Doherty stated that the commercial sex activity at the Red Roof Inn was "well known" and obvious to other area law enforcement officers.[48] Officer Doherty stated that in his experience, 90% or more of those engaged in commercial sex were sex trafficking victims and that a property's greatest risk factor for sex trafficking occurring is allowing prostitution.[49] Gwinnett County Police Officer Erin Richardson stated that the Red Roof Inn was

---

[45] Ex. 8, Warbington Decl. ¶ 2.
[46] Ex. 8, Warbington Decl. ¶ 4; 6.
[47] Ex. 8, Warbington Decl. ¶ 6.
[48] Ex. 7, Doherty Decl. ¶ 4,¶ 5.
[49] Ex. 7, Doherty Decl. ¶ 4; ¶ 7.

known for high crime, prostitution, and sex trafficking, and that activity was so obvious the hotel staff should have known about it.[50] Officer Richardson observed, "[i]t was obvious to me that the hotel made most of its money by renting to people engaged in criminal activity, including drugs, prostitution, or sex trafficking."[51]

### ii.        The Red Roof Inn ignored reports of commercial sex.

The Red Roof Inn permitted commercial sex to persist. Officer Doherty concluded that the hotel "did not try to get rid of the commercial sex on the property before 2012[] . . . [and] did not work with the police to report crime and commercial sex;" rather, "[t]he Red Roof Inn turned a blind eye to the commercial sex at the property."[52] Mr. Stump, the weekend security guard, often reported prostitution and drug activity to the hotel's night managers, who promised to report it to the day staff and to the hotel manager.[53] One time when he made his report, he was told "[t]here is nothing we can do about it."[54] So while he "would report it to a night manager," "they were either told by the hotel manager not to involve themselves or to just make a note of it. . . . That seemed to be the big answer for everything is we'll just make a note of it."[55]

---

[50] Ex. 6, Richardson Aff. ¶ 9.
[51] Ex. 6, Richardson Aff. ¶ 9.
[52] Ex. 7, Doherty Decl. ¶ 4,¶ 5.
[53] Ex. 5, Stump Dep. 19:25–20:5; 21:9–17.
[54] Ex. 11, Stump Aff. ¶ 6.
[55] Ex. 5, Stump Dep. 32:15–21.

Ms. Gilmore occasionally called the police while at Red Roof Inn, and every time she did, she reported the criminal activity to the hotel's general manager.[56] Even when she did not call the police, she reported criminal activity to the day shift employees.[57] Regional Vice President of Operations Jay Moyer visited the Red Roof Inn when Ms. Gilmore was working and while criminal activity was happening.[58]

Mr. Warbington, the community improvement director, spoke to the hotel's managers and employees about the continuing problems with commercial sex, but the managers had no response.[59] Mr. Warbington noted that "[i]nstead of working with the Police Department and the District Attorney's office the hotel appeared to be working against them and helping the commercial sex trade to flourish at the Red Roof Inn hotel."[60] Indeed, Mr. Warbington called Red Roof corporate about those issues multiple times, but no one from Red Roof corporate returned his calls.[61] Mr. Warbington also sent multiple letters to Red Roof corporate "describing the problem of commercial sex on their property and asking them to provide a solution to help stop or curtail the sex trade at the Red Roof Inn. Red Roof Inns corporate never responded to my calls or these letters."[62]

---

[56] Ex. 4, Gilmore Dep. 79:19–80:9.
[57] Ex. 4, Gilmore Dep. 78:3–10; 80:1–9.
[58] Ex. 4, Gilmore Dep. 78:13–23.
[59] Ex. 8, Warbington Decl. ¶ 5.
[60] Ex. 8, Warbington Decl. ¶ 7.
[61] Ex. 8, Warbington Decl. ¶ 10.
[62] Ex. 8, Warbington Decl. ¶ 10.

While Defendants claim that sex trafficking, as a concept, was unknown to them before 2013 and 2014; the evidence shows otherwise. Defendants' 30(b)(6) witness on security topics, Greg Stocker, testified that Red Roof has known *since at least 2010* that prostitution and sex trafficking share indicators, including a large number of condoms in a room, scantily clad women loitering, and heavy foot traffic in and out of rooms, with visitors staying for only short periods.[63] In March 2012, two months after H.B. was rescued, Red Roof distributed anti-trafficking flyers produced by the Department of Homeland Security to its properties like the Red Roof Inn and requested that they post them "in the break room of their propert[ies]."[64] Mr. Moyer—who was in charge of safety and security at the Red Roof Inn while H.B. was trafficked—testified that his "best recollection" was that he learned of "sex trafficking" when the movie *Taken* came out in 2008.[65]

### iii.    The Red Roof Inn allowed commercial sex to increase profits.

The Red Roof Inn's policy prioritized profits over safety.[66] When Ms. Gilmore was asked if the hotel's policy was to rent rooms and make money even if she suspected the guests were engaged in commercial sex, she replied, "[o]ur policy was heads in beds, so sell the rooms."[67] She confirmed that "we were just meant to

---

[63] Ex. 12, Stocker W.K. 30(b)(6) Dep. 36:25–39:15.
[64] Ex. 13, RRI_WK_00038055– RRI_WK_00038077.
[65] Ex. 14, Moyer W.K. Dep. 327:5–19.
[66] Ex. 4, Gilmore Dep. 22:16–23:6.
[67] Ex. 4, Gilmore Dep. 22:1–7.

sell as many rooms as possible. We didn't turn anyone away. It was to make revenue, to sell rooms."[68] She summed up her view this way: "I was told the priority was to rent rooms. Because of this, it is my opinion that Red Roof Inns cared more about the money they made on rooms than the safety of their guests or employees at the Red Roof."[69] Ms. Gilmore was not trained on crime prevention, nor was she trained on how to spot or prevent commercial sex or sex trafficking.[70] "No one told [her] if you suspect a person, don't rent to them. That was never anything that was told to me by management, corporate or anyone."[71] The inmates ran the asylum at the Red Roof Inn and were confident about their permission to operate out of the hotel; when Ms. Gilmore called the police to report crime at work, she "would get calls . . . telling me I was an F'ing snitch and to watch out because . . . they knew where I lived or where I was walking from."[72]

Mr. Warbington stated, "it was clear to me, as it would be anyone that visited this hotel, that the Red Roof Inn allowed a busy commercial sex trade to occur at the hotel, and, to my knowledge, never took any steps to prevent or prohibit these sex crimes at the hotel. In fact, it appeared Red Roof Inn profited from renting rooms to

---

[68] Ex. 4, Gilmore Dep. 90:25–91:2.
[69] Ex. 10, Gilmore Aff. ¶ 13.
[70] Ex. 4, Gilmore Dep. 18:21–19:4.
[71] Ex. 4, Gilmore Dep. 28:8–16.
[72] Ex. 4, Gilmore Dep. 27:15–28:1.

these criminals and wanted to keep that business going."[73]

Defendants' disregard for safety was not limited to the Red Roof Inn but rather occurred at the highest corporate level. Despite operating about 200 corporate hotels, Defendants did not have a safety and security director from 2010–2012.[74] Instead, Mr. Moyer and his supervisor, Senior Director of Operations Dan Russell, were responsible for safety and security at the Red Roof Inn at that time.[75] Mr. Moyer, the evidence shows, had a pattern of explicitly permitting sex trafficking and minor sex trafficking at the hotels he oversaw.[76] At one such hotel in Buckhead, about 12 miles from the Red Roof Inn, a front desk employee testified that pimps were selling young girls for sex and that the open sale of young girls for sex caused guests to complain.[77] To cut down on guest complaints, Mr. Moyer told this employee to put the pimps and the young girls they sold for sex on the back side of the hotel and to put the more "family-oriented individuals" on the front side.[78] At the Red Roof Inn in Smyrna, a front desk employee witnessed Mr. Moyer observe "young girls, old girls, prostitutes, pimps, all ages, all colors" along with high buyer traffic at the hotel.[79]

---

[73] Ex. 8, Warbington Decl. ¶ 11.
[74] Ex. 9, Defendants' 30(b)(6) Dep. 83:1–17; 89:9–18; Ex. 12, Stocker W.K. 30b6 Depo.79:14–80:8; Ex. 15, McElroy W.K. Dep. 15:23–25; Ex. 16 Vittatoe W.K. Depo. 144:23–25.
[75] Ex. 9, Defendants' 30(b)(6) Dep. 83:20–84:19.
[76] Ex. 17, Thomas W.K. Dep. 40:1–44:22.
[77] *Id.*
[78] *Id.*
[79] Ex. 18, Castille W.K. Dep. 44:5–46:12.

Mr. Moyer took no steps to curb this illegal activity. According to the Smyrna employee, the hotel "was always like that. It just got worse, but it never stopped."[80] Later, when the Buckhead hotel was upgrading to the more expensive Red Roof Plus+ status, Mr. Moyer summed up the transition in an email: ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

    **iv.**    **Defendants' conflicting testimony about their corporate hotel operations.**

At all times relevant to this action, the Red Roof Inn was a corporately owned and operated hotel.[82] While Defendants refer to myriad Red Roof-related companies as "affiliates,"[83] this term merely means that the Red Roof Inn was "a corporate managed property."[84] A corporate managed property is distinct from a franchised property; and hotels like the Red Roof Inn, managed by RRI West, were on the "corporate side," not the "franchisee side"[85] ████████████████████████████

████████████████████████

████████████████████████████████████████

---

[80] Ex. 18, Castille W.K. Dep. 45:25–46:1.
[81] Ex. 19, RRI WK 00004955.
[82] Ex. 20, Moyer H.B. Dep. 14:22–15:8; 15:18–16:17; 17:16–20:7; Ex. 9, Defendants' 30(b)(6) Depo. 44:17–45:2.
[83] Ex. 9, Defendants' 30(b)(6) Dep. 44:10–19.
[84] Ex. 9, Defendants' 30(b)(6) Dep. 44:17–45:2.
[85] Ex. 9, Defendants' 30(b)(6) Dep. 45:3–20.



Jay Moyer, the VP of Operations, made clear that he only oversaw "corporately-owned hotels" and did not oversee "any franchised hotels."[88] Regardless of terminology, ***Defendants admitted that the Red Roof Inn could not function without the services each Defendant provided***.[89]

The relationship between Defendants, like many corporate structures, is more complex on paper than in reality. ███████████████████████ ████████████████████████████████████████████.[90]

RRI West managed and operated the Red Roof Inn.[91] ████████████ ████████████████████████████████████.[92] RRI West determined room rates and had the right to determine operating policy and

---

[86] Ex. 21, The Hotelier's Guide, RRI_WK_00001407. This guide refers to "corporate" hotels or properties thirteen times.

[87] Ex. 21, The Hotelier's Guide, RRI_WK_00001411.

[88] Ex. 20, Moyer H.B. Dep. 14:22–15:8; 15:18–16:17; 17:16–20:7.

[89] Ex. 9, Defendants' 30(b)(6) Dep. 27:18–28:19.

[90] Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; 33:25–34:6.

[91] Ex. 9, Defendants' 30(b)(6) Dep. 35:13–22.

[92] Ex. 9, Defendants' 30(b)(6) Dep. 24:18–25:15.

standards.[93] RRI Inc. provided the brand's standards, required training, and paid all of the Red Roof Inn's employees.[94] RRI Inc. exerts control by mandating the safety and security training that all hotel staff must complete.[95] ██████████████

████████████████████████████████████████████████████████

Defendants admitted that it was "negligent" for a hotel not to provide mandatory safety and security training to its employees.[97] Yet Ms. Gilmore never got this "mandatory" training.[98]

████████████████████████████████████████████████

████████████[99] But most evidence shows something else: RRI Inc. employed the hotel staff. In fact, in the property management agreement Defendants cite,

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[93] Ex. 22 § 4.1(b–c), HB_NDGA_Red_Roof_00001540.

[94] RRI Inc. Brief Doc. No. 94-1 at 6 ("RRI Inc. requires all on-site managers to undergo security training[.]"); Ex. 9, Defendants' 30(b)(6) Dep. 58:4–5; 63:1–4; Defs.' SUF No. 44.

[95] RRI Inc. Brief Doc. No. 94-1 at 6 ("RRI Inc. requires all on-site managers to undergo security training[.]"); Ex. 9, Defendants' 30(b)(6) Dep. 63:1–4.

RRI Inc. Brief Doc. No. 94-1 at 6 ("RRI Inc. requires all on-site managers to undergo security training[.]"); Ex. 9, Defendants' 30(b)(6) Dep. 63:1–4.

[96] Ex. 23, § 2.2.3, HB_NDGA_Red_Roof_00001625.

[97] Ex. 9, Defendants' 30(b)(6) Dep. 63:23–64:2.

[98] Ex. 4, Gilmore Dep. 18:21–19:4.

[99] Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; Deft's SUF No. 45.

[100] Ex. 22, § 3.3(c), HB_NDGA_Red_Roof_00001527.

But that's not all. Andrew Alexander, President of RRI Inc. when H.B. was trafficked (who was himself an RRI West employee), testified that RRI Inc. employed "the inn-level employees" such as the general managers and housekeepers at hotels like the Red Roof Inn.[103] George Limbert, who succeeded Mr. Alexander as President, testified that RRI Inc. employed the staff—housekeepers, general managers, maintenance, laundry, and front desk—at corporate managed hotels like the Red Roof Inn.[104] Mr. Moyer, who worked for Red Roof Inns for 30 years, received his paycheck from RRI Inc. and could only say that his employer was "Red Roof Inns," though Defendants testified he was (unwittingly, it seems) an employee of RRI West.[105] Ms. Gilmore was employed by "Red Roof Inns" while she worked at the hotel from 2011–2013.[106] Vanessa Cole, a floating general manager who worked at the Red Roof Inn, was employed by Red Roof Inns, Inc.[107] In a federal

---

[101] Ex. 22, §§ 3.3(c), 3.6 HB_NDGA_Red_Roof_00001534.
[102] Ex. 22, § 10.5(d)(i), HB_NDGA_Red_Roof_00001561.
[103] Ex. 24, Alexander W.K. Dep. 67:15–24.
[104] Ex. 25, Limbert W.K. Dep. 143:4–14.
[105] Ex. 14, Moyer W.K. Dep. 24:21–25:17; Ex. 9, Defendants' 30(b)(6) Dep. 54:7–55:11.
[106] Ex. 10, Gilmore Aff. ¶2.
[107] Ex. 26, Cole Decl. ¶3.

employment case involving another corporately managed hotel in Atlanta, RRI Inc. *admitted* in its answer that it was the employer of the hotel staff.[108]

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (quoting *Anderson*, 477 U.S. at 251).

## III.   ARGUMENT

### A.    Defendants violated the TVPRA as to H.B.

H.B. sued Defendants under the civil remedy provision of the TVPRA, 18

---

[108] Ex. 27, Complaint and Answer, *Coleman v. Red Roof Inns, Inc.*, No. 1:13-cv-01274-WSD, Docs. 1, 4 (admitting in answer the allegations of paragraphs 5–7 that Red Roof Inns Inc. was the employer of the hotel staff).

U.S.C. § 1595(a). Because H.B. was a minor, any commercial sex she had was, by definition, sex trafficking. *See* 18 U.S.C. § 1591(a) (providing that minors cannot consent to commercial sex, and minor commercial sex is sex trafficking, regardless of any force, fraud, or coercion). The TVPRA provides "sex-trafficking victims a civil cause of action against 'the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA])." *Doe #1*, 21 F.4th at 723 (quoting 18 U.S.C. § 1595(a)). H.B. sued Defendants for benefiting from her sex trafficking. To prevail on her claim, she must show that Defendants

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff and (4) the defendant[s] had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Doe #1*, 21 F.4th at 726; *see also D.H. v. Tucker Inn Inc.*, 1:22-CV-3419-JPB, 2023 WL 6538391, at *4 (N.D. Ga. Sept. 1, 2023) (citing *United States v. Whyte*, 928 F.3d 1317, 1328 (11th Cir. 2019)) (discussing § 1591(a) standard in context of motion to dismiss for failure to state a claim).

### i.   Defendants knowingly benefitted from the hotel.

Defendants each knowingly benefitted financially from participating in the Red Roof Inn. ███████████████████████████████████████████

███████[109] FMW RRI and RRI West admit it.[110] RRI Inc. says it "did not *directly*

receive any portion" of the gross room revenues, but RRI Inc. testified it "ultimately"

received a portion of the gross room revenues from Red Roof Inn Franchising,

LLC.[111] Thus, when H.B.'s trafficker paid to rent the rooms in which H.B. was sold

for sex, each Defendant benefitted financially from that payment.[112]

So far, every court to analyze this element "ha[s] found that the rental of a

room constitutes a financial benefit from a relationship with the trafficker sufficient

to meet this element of the § 1595(a) standard." *J.G. v. Northbrook Indus., Inc.*, 619

F. Supp. 3d 1228, 1234 (N.D. Ga. 2022) (citing *A.G. v. Northbrook Indus., Inc.*,

1:20-CV-05231-JPB, 2022 WL 1644921, at *2 (N.D. Ga. May 24, 2022); *G.W. v.

Northbrook Indus., Inc.*, 1:20-CV-05232-JPB, 2022 WL 1644923, at *2 (N.D. Ga.

May 24, 2022); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp.3d 959, 965

(S.D. Ohio 2019); *S.Y. v. Naples Hotel Co.*, 476 F. Supp.3d 1251, 1257 (M.D. Fla.

2020); *Ricchio v. Bijal, Inc.*, 386 F. Supp. 3d 126, 131 (D. Mass. 2019) (even *de

minimis* benefit sufficient)). As each Defendant knowingly benefitted from the Red

---

[109] Ex. 9, Defendants' 30(b)(6) Dep. 48:3–49:9; Ex. 28, Park W.K. 30(b)(6) Dep. 79:7–80:23; 86:13–87:1; Ex. 28, Park W.K. 30(b)(6) Dep. 83:24–84:13.

[110] *See* Doc. Nos. 95-1 at 9; 96-1 at 5–6.

[111] Ex. 28, Park W.K. 30(b)(6) Dep. 83:24–84:5, referring to fees at 79:12–80:12.

[112] While RRI Inc., appears to claim that its indirect receipt of revenue precludes liability, RRI Inc. cites no supporting law, (Doc. No. 94-1 RRI at 9). Nor does the TVPRA require a direct versus indirect benefit, but only a "benefit" that is financial or "anything of value." 18 U.S.C. § 1595(a).

Roof Inn, this element is satisfied.

### ii.   Defendants participated in the Red Roof Inn venture.

*First*, the Red Roof Inn, like every other for-profit business, was a venture under the TVPRA. A "venture" under the TVPRA is "an undertaking or enterprise involving risk and potential profit." *Doe #1*, 21 F.4th at 724 (citing Black's Law Dictionary (11th ed. 2019)). Defendants do not—and cannot—dispute that their business (the hotel) meets this definition. Indeed, a for-profit hotel with a complex corporate structure is a "common undertaking" that involves some risk for the purpose of generating a profit. *Id.*

Contrary to Defendants' protestations, the venture does not have to be a "sex trafficking venture" to violate the TVPRA. The Eleventh Circuit has established that "a person can be liable without participating in the sex trafficking act itself." *Does 1–4*, 2023 WL 5444261, at *3 (citing *Doe #1*, 21 F.4th at 723); *see also C.T. v. Red Roof Inns, Inc.*, 2:22-CV-834-JES-KCD, 2023 WL 3510879, at *3 (M.D. Fla. Mar. 11, 2023) ("Best Western . . . says Plaintiff needs to 'allege [a] venture between [Best Western] and [the] unidentified *traffickers*.' But that is not the case. For this element, Plaintiff need only show that Best Western participated in a venture that

violated her rights under the TVPRA." (citing *Doe #1*, 21 F.4th at 726)).[113]

*Second,* each Defendant participated in the Red Roof Inn venture, though how each participated is disputed and contradicted by Defendants' own testimony. Regardless, Defendants admitted that the hotel could not function without the services each Defendant provided.[114] That admission alone proves that Defendants "took part in" the Red Roof Inn venture.[115]

The undisputed facts are that (1) FMW RRI owned the property;[116] ███

████████████████████████████████████████████████████████████

██████████████████████████████████████ [17] If these were the only facts, they are enough to show that each Defendant took part in the operation of the Red Roof Inn.

---

[113] The *C.T.* court held that "[i]n *Doe #1*, the Eleventh Circuit took great pains to highlight that its decision was based on the complaint's allegations of "sex trafficking ventures" and not "commercial ventures." *C. T.*, 2023 WL 3510879, at *4 (citing *Doe #1*, 21 F.4th at 726–27). Here, H.B. never calls the ventures "sex trafficking ventures" or anything similar. Instead, all references are to a commercial, hotel-operating enterprise. So the Court need only consider whether operating a hotel is an enterprise involving risk and potential profit. It is.

[114] Ex. 9, Defendants' 30(b)(6) Depo. 27:18–28:19.

[115] "The ordinary meaning of participate or participation is to take part in or share with others in common or in an association." *Doe #1*, 21 F.4th at 725.

[116] As the Red Roof Inn's owner, FMW RRI had a nondelegable duty to keep that Georgia premises safe, O.C.G.A. § 51-3-1, and had "constructive notice of what a reasonable inspection conducted in the exercise of ordinary care would reveal." *Johnson St. Props., LLC v. Clure*, 805 S.E.2d 60, 65 (Ga. 2017).

[117] Doc. No. 94-1 at 6; Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; 35:13–22; 58:4–5; Defendants' SOMF 45.

Defendants testified that RRI West was responsible for nearly everything at the Red Roof Inn (besides owning the property): employing staff, hiring and firing, setting the pay scales and hours, making decisions for FMW related to the property, and making the policies for hotel employees .[118] In short, "RRI West managed corporate properties" like the Red Roof Inn and Defendants testified that the hotel could not function without management.[119] Defendants also testified the hotel could not function if its employees were not paid, and they concede that this was part of RRI Inc.'s contribution, along with brand standards and training.[120]

Defendants are adamant that RRI West employed the hotel's employees, but most evidence contradicts this claim. The evidence shows that RRI Inc. employed the hotel staff and managers while RRI West managed those hotel employees.[121] The supporting evidence is overwhelming and makes the material fact of which entity employed the hotel employees disputed.

For example, ███████████████████████████████████

---

[118] After passing the buck, Defendants, including RRI West, then testified that they "don't know a lot about [RRI West]." Ex. 9, Defendants' 30(b)(6) Depo. 38:5–7; 53:5–8.

[119] Ex. 9, Defendants' 30(b)(6) Dep. 27:18–28:19; 45:3–20.

[120] Ex. 9, Defendants' 30(b)(6) Dep. 27:18–28:19; 58:4–5; Ex. 22, §§ 3.3(c), 3.6 HB_NDGA_Red_Roof_00001534.

[121] Ex. 24, Alexander W.K. Dep. 67:15–24; Ex. 25, Limbert W.K. Dep. 143:4–14; Ex. 14, Moyer W.K. Dep. 24:21–25:17; Ex. 10, Gilmore Aff. ¶2; Ex. 26, Cole Decl. ¶3; Ex. 9, Defendants' 30(b)(6) Dep. 35:13–17, 54:7–55:11.

███████████████████████████████ And when three staff members at another Atlanta area corporately managed Red Roof Inn sued RRI Inc for labor violations in 2012, RRI Inc. *admitted* it was those employees' employer.[123] That admission—that RRI Inc., not RRI West, employed the corporate managed hotel staff—confirms RRI Inc.'s former president Andrew Alexander's testimony that while RRI West employed him, RRI Inc. employed the "inn-level employees," like general managers and hotel staff.[124] His successor agreed and so did floating general manager Vanessa Cole, who worked at the Red Roof Inn.[125] Heather Gilmore testified that "Red Roof Inns" was her employer for her three years at the hotel.[126] Jay Moyer said the same: "Red Roof Inns" was his employer, though Defendants testified that RRI West employed Mr. Moyer (unwittingly, it seems) for 30 years.[127]

Employing the staff who permitted commercial sex at the hotel and who acted as lookouts for H.B.'s trafficker is taking part in the operation of the Red Roof Inn. *Does 1–4 v. Red Roof Inns, Inc.*, 1:21-CV-04278-WMR, 2023 WL 5444261, at *3 (N.D. Ga. Aug. 10, 2023) (summary judgment denied against multiple Red Roof

---

[122] Ex. 22, HB_NDGA_Red_Roof_00001512.

[123] Ex. 27, Complaint and Answer, *Coleman v. Red Roof Inns, Inc.*, No. 1:13-cv-01274-WSD, Docs. 1, 4 (admitting in their answer the allegations of paragraphs 5–7 that Red Roof Inns Inc. was the employer of the hotel staff).

[124] Ex. 24, Alexander W.K. Dep. 67:15–24.

[125] Ex. 25, Limbert W.K. Dep.143:4–14; Ex. 26, Cole Decl. ¶¶2,3.

[126] Ex. 10, Gilmore Aff. ¶2.

[127] Ex. 14, Moyer W.K. Dep. 24:21–25:17; Ex. 9, Defendants' 30 (b)(6) Dep. 54:7–55:11.

entities (including RRI Inc. and RRI West) at corporate managed hotels based on the conduct and knowledge of "hotel employees"); *W.K. v. Red Roof Inns, Inc.*, 1:20-CV-05263-VMC, 2023 WL 6290523, at *10 (N.D. Ga. Sept. 14, 2023) (same, based on the knowledge of "the Red Roof Defendants and their employees").

The Seventh Circuit held that "culpable assistance" satisfied the participation prong a TVPRA beneficiary claim. "[A] plaintiff may sufficiently allege such "culpable assistance" by showing "a continuous business relationship" between the participant and the trafficker. Where the participant provides assistance, support, or facilitation to the trafficker through such a "continuous business relationship," a court or jury may infer that the participant and trafficker have a "tacit agreement" that is sufficient for "participation" under Section 1595." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 559 (7th Cir. 2023). That accords with what this Court has held *Doe #1* required: a "continuous business relationship." *See Tucker Inn Inc.*, 2023 WL 6538391, at *4; *A.G.*, 2022 WL 1644921, at *2; *G.W.*, 2022 WL 1644923, at *2. Here, over the course of three weeks, Lucky rented rooms,[128] left and briefly took H.B. to be sold at other hotels, and returned repeatedly to the Red Roof Inn to traffic

---

[128] Ex. 1, H.B. Depo. 241:5–8. *Doe #1* never held that renting rooms to traffickers is not participation. The manipulated quote Defendants use (*see, e.g.,* Doc. No. 94-1 at 11) regarded actual hotel franchisors, not the hotel operators, which Defendants are. The franchisors' employees in *Doe #1* did not themselves rent rooms to traffickers. 21 F.4th at 727. Here, Defendants did.

H.B.[129] This is sufficient for the jury to infer the Red Roof Inn and Lucky had a tacit agreement and "continuous business relationship" that satisfies the participation prong of the TVPRA.

In short, each Defendant made indispensable contributions to the hotel's operation, each defendant profited from "taking part in" the hotel, and each Defendant had a continuous business relationship with H.B.'s trafficker.[130] Thus, Defendants participated in the venture under the TVPRA.

### iii.    The venture violated the TVPRA.

The Red Roof Inn violated the TVPRA as to H.B. Most obviously, H.B. was harbored and maintained—violating § 1591(a)(1)—at the Red Roof Inn while she was sold for sex as a minor. Defendants' employees actively assisted H.B.'s traffickers by acting as lookouts, and the hotel had an ongoing business relationship with Lucky, repeatedly renting him rooms during the weeks he trafficked H.B.[131] These facts, discussed more fully *supra* at 4–6, prove that the venture violated the TVPRA as to H.B. *See Does 1–4*, 2023 WL 5444261, at *3 (discussing the ongoing business relationship with known pimps and prostitutes in which they rented rooms to be used for commercial sex); *W.K.*, 2023 WL 6290523, at *10 (same).

---

[129] Ex. 1, H.B. Dep. 265:13–14.

[130] Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; 27:18–28:19; 33:25–34:6; 35:13–17; 58:4–5; 63:1–4; RRI, Inc. Brief Doc. No. 94-1 at 6 ("RRI, Inc. requires all on-site managers to undergo security training[.]"); Deft's SUF No. 44.

[131] Ex. 1, H.B. Dep. 243:4–11; 244:5–15; 245:21–246:4.

Additionally, the hotel's policy was to rent rooms for the purpose of illegal commercial sex, something Heather Gilmore did regularly for three years.[132] Officer Jon Doherty testified that in his experience—which includes his experience at the Red Roof Inn—90% or more of those engaged in commercial sex were sex trafficking victims and a property's greatest risk factor for sex trafficking occurring is allowing prostitution.[133] This risk is obvious in H.B.'s case. The difference between "voluntary" prostitution and minor sex trafficking is strictly a matter of the victim's age. 18 U.S.C. § 1591(a)(2). A hotel that *knows* it is allowing prostitution recklessly disregards the risk that one person having commercial sex is under the age of 18, which is *de facto* minor sex trafficking. And benefitting financially while recklessly disregarding that risk is *criminal* sex trafficking. 18 U.S.C. § 1591(a)(2). Thus, Defendants' venture violated the TVPRA as to H.B., whether recklessly, with actual knowledge, or with constructive knowledge.

### iv. Defendants knew or should have known the venture violated the TVPRA as to H.B.

Defendants knew or should have known their venture violated the TVPRA as to H.B. As Judge Ray recently explained,

> it is well established that a federal claim's "knowledge element" "can be proved by demonstrating either actual knowledge or deliberate ignorance." "If a party has his suspicions aroused but then deliberately omits to make further enquiries, because he wishes to remain in

---

[132] Ex. 4, Gilmore Dep. 20:22–21:7; 21:9–19; 22:1–7; 28:2–7; 90:25–91:2.
[133] Ex. 7, Doherty Decl. ¶ 4; ¶ 7.

> ignorance, he is deemed to have knowledge." And to prove either actual knowledge or deliberate ignorance, [a] Plaintiff may rely on both direct evidence and circumstantial evidence based on the "totality" of circumstances.

*Does 1–4*, 2023 WL 5444261 at *3 (internal citations omitted); *see also W.K.*, 2023 WL 6290523, at *9–10. Such circumstantial evidence may include, for example, a showing that a trafficker "had prior commercial dealings with" the hotel operators through the operator's renting of rooms to a trafficker to serve their joint business objectives, and the parties "wished to reinstate [those dealings] for profit." *Doe #1,* 21 F.4th at 725–26 (citing *Ricchio v. McClean,* 853 F.3d 553, 55 (1st Cir. 2017)).

The evidence cited by Judge Ray and Judge Calvert in denying motions for summary judgment involving RRI Inc. and RRI West at two other corporately managed Red Roof Inns in metro Atlanta, included:

> hotel employees regularly observed pimps and prostitutes using the rooms; some of the prostitutes appeared to be young or underage; Red Roof management had received complaints of prostitution and, as a result, asked hotel employees to book suspected sex workers in rooms located in the back of the hotel where they would be less visible to guests; some employees acted as lookouts and notified the pimps when police were nearby or on the premises; and some of the prostitutes had an emaciated appearance and exhibited signs of physical abuse and Defendants were aware that these manifestations are known indicators of sex trafficking.

*Does 1–4*, 2023 WL 5444261, at *3; *W.K.*, 2023 WL 6290523, at *10.

Coincidentally, similar facts are evident here, at a third corporately managed Red Roof Inn in metro Atlanta. The night auditor, the security guard, two police

officers, and a community improvement director all testified that they observed commercial sex occurring at the Red Roof Inn.[134] Mr. Warbington, the community improvement director, saw young girls among those soliciting sex at the Red Roof Inn and was solicited while driving through the property.[135] When he informed the hotel's managers and Red Roof corporate about the "horrific" commercial sex at the hotel, he got no response.[136] Heather Gilmore, the night auditor, testified that she rented rooms to those suspected of engaging in commercial sex largely on the back side of the hotel.[137] Multiple employees acted as lookouts for H.B.'s traffickers,[138] and Mr. Warbington could tell that employees were protecting the commercial sex trade at the Red Roof Inn.[139] Police officers knew that the hotel "did not try to get rid of the commercial sex on the property," "turned a blind eye to" it, and "made most of its money by renting to people engaged in criminal activity, including drugs, prostitution, or sex trafficking."[140]

The "totality" of these material facts creates a genuine dispute about whether Defendants "knew or should have known that they benefitted from their participation

---

[134] Ex. 4, Gilmore Dep. 20:22–21:7; 21:9–19; 22:1–7; 28:2–7; Ex. 5, Stump Dep. 17:24–18:9; Ex. 8, Warbington Decl. ¶2; Ex. 7, Doherty Decl. ¶4; Ex. 6, Richardson Aff. ¶9.

[135] Ex. 8, Warbington Decl. ¶¶ 4,6.

[136] Ex. 8, Warbington Decl. ¶ 10.

[137] Ex. 4, Gilmore Dep. 20:22–21:7; 21:9–19; 21:21–24; 28:2–7; 87:8–14; 88:8–89:7.

[138] Ex. 1, H.B. Dep. 243:4–11; 244:5–15; 245:21–246:4.

[139] Ex. 8, Warbington Decl. ¶ 7.

[140] Ex. 7, Doherty Decl. ¶5; Ex. 6, Richardson Aff. ¶9.

in a venture that violated the TVPRA." *See Does 1–4,* 2023 WL 5444261 at *4. Thus, summary judgment is prohibited on this issue.

### B.    Defendants are directly liable for violating the TVPRA.

As the preceding sections show, Defendants "own acts, omissions, and state of mind establish each element" of H.B.'s TVPRA beneficiary claim. *L.H. v. Red Roof Inn, Inc.*, 3:22-CV-625-CHB, 2023 WL 5725574, at *6 (W.D. Ky. Sept. 5, 2023) (quoting *H.G. v. Inter-Continental Hotels Corp.*, 489 F. Supp. 3d 697, 704 (E.D. Mich. 2020)). Defendants' liability under § 1595(a) is thus direct. And to prevail at trial, H.B. need not prove more than that. But H.B. can also prevail at trial by "imput[ing] to the defendant the acts, omissions, and state of mind of an agent of the Defendant." *Id.* (quoting *H.G.*, 489 F. Supp. 3d at 704). That is, by proving that each Defendant is indirectly or vicariously liable based on the acts of another.[141]

### C.    Defendants are indirectly liable for violating the TVPRA.

Defendants' claim that Congress made a "clear and explicit" choice to obviate vicarious liability under the TVPRA, but that claim has been repeatedly rejected. *See, e.g.*, *T.E. v. Wyndham Hotels & Resorts, Inc.*, No. 2:22-cv-3185, 2023 WL 5531441, * 7 (S.D. Ohio Aug. 28, 2023) ("The TVPRA . . . does not address the issue of indirect or vicarious liability; therefore, federal district courts that have

---

[141] See preceding section.

adjudicated this issue must apply common law to fill in the gaps.").[142]

The TVPRA permits vicarious liability because in creating a tort action like the TVPRA, Congress presumptively "legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Vicarious liability is a well-established common-law principle, so federal common law governs the application of vicarious liability to TVPRA claims. *See Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1168 (11th Cir. 2021) (holding the "[c]ommon law . . . recognizes vicarious liability]"); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (applying federal common-law vicarious liability to federal statute); *Doe by Doe v. Piraino*, 3:22-CV-00560, 2023 WL 5310556, at *8 (M.D. Tenn. Aug. 17, 2023) ("Federal common law agency principles apply to [TVPRA] claims.").

### i.    Defendants are liable for the acts of each other.

Under federal common law, a legal entity can be held liable for the acts of someone else based on theories of corporate veil piercing and general agency (among others).[143] *See, e.g.*, *Cordoba,* 942 F.3d 1259, 1265 (applying federal

---

[142] *See also Treminio v. Crowley Mar. Corp.*, --- F. Supp. 3d ---, 2023 WL 113565, *4 (M.D. Fla. Jan. 4, 2023) (collecting cases).

[143] Legal entities are also vicariously liable for the conduct of their own employees under the doctrine of respondeat superior.

common-law vicarious liability to federal statute); *United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1505–06 (11th Cir. 1988) (applying federal common law of alter ego to pierce corporate veil).

Here, even if some or all Defendants were not directly liable under the TVPRA (and all are), all Defendants are vicariously liable. The record is replete with facts—many of which are disputed (sometimes by Defendants' own testimony)—that support imputing the misconduct of one or more Defendants to other Defendants. This is because the record contains not only conflicting evidence but also evidence of the interconnectedness of Defendants' operations.

A few highlights illustrate the point.

Defendants testified that the Red Roof Inn could not have operated without each Defendant's contributions.[144] ██████████████████████████████

████████████████[145]

The Red Roof Inn had employees. Which entity employed them is disputed: most evidence shows it was RRI Inc.; some evidence shows that it was RRI West. *Supra* 17–19. Given this confusion—and among people who should know, like two former Red Roof presidents—a jury could reasonably infer that (1) RRI Inc. and RRI West both employed the hotel staff, and (2) that RRI Inc. and RRI West were not

---

[144] Ex. 9, Defendants' 30(b)(6) Dep. 27:18–28:19.
[145] Ex. 9, Defendants' 30(b)(6) Dep. 48:3–49:9; Ex. 28, Park W.K. 30(b)(6) Dep. 79:7–80:23; 86:13–87:1; Ex. 28, Park W.K. 30(b)(6) Dep. 83:24–84:13.

separate legal entities.

The inference that RRI Inc. and RRI West were not separate legal entities has additional support. Andrew Alexander testified that he was the president of RRI Inc. and was simultaneously the "top guy" at RRI West.[146] Despite running both companies, Alexander testified that he was an employee of RRI West and that he was paid by RRI West.[147] It makes no sense for the president of RRI Inc. to be employed and paid by RRI West for his work at RRI Inc. if the two entities are separate. To state the obvious, Target doesn't pay Wal-Mart's CEO, and Wal-Mart's CEO doesn't work for Target.

The record further supports the inference that RRI Inc. and RRI West were not separate legal entities. Both RRI Inc. and RRI West established policies for hotel staff.[148] ██████████████████████████████████████████[149] Both were essential to running the Red Roof Inn.[150] Yet despite being essential to running the Red Roof Inn, only RRI Inc. has ever registered to do business in Georgia; RRI West has never been registered to do business in Georgia.[151] Again, this is not how Target and Wal-Mart operate.

---

[146] Ex. 9, Defendants' 30(b)(6) Dep.134:11–17.
[147] Ex. 24, Alexander W.K. Dep. 15:9–17.
[148] Ex. 9, Defendants' 30(b)(6) Dep. 38:5–7; 58:4–5.
[149] Ex. 9, Defendants' 30(b)(6) Dep. 48:3–49:9; Ex. 28, Park W.K. 30(b)(6) Dep. 79:7–80:23; 86:13–87:1; Ex. 28, Park W.K. 30(b)(6) Dep. 83:24–84:13.
[150] Ex. 9, Defendants' 30(b)(6) Dep. 27:18–28:19.
[151] Ex. 29, RRI Inc.'s registration with Georgia Secretary of State.

[152] That means RRI West made the decision to "lease" the Red Roof Inn to another Red Roof entity. That also means RRI West controlled FMW RRI's operations (such as they were) and bank accounts. FMW RRI received money from the Red Roof Inn.[153] But Defendants could not explain where that money ended up.[154] A reasonable inference, given RRI West's complete control of FMW RRI, is that FMW RRI's money benefited RRI West.

The record further supports that RRI West and FMW RRI are not separate legal entities. According to Defendants, FMW RRI leased the property to another company and then that company hired RRI West to manage the Red Roof Inn's day-to-day operations.[155] Since FMW RRI had no employees and RRI West made all decisions for FMW RRI, the lease signer worked for RRI West; thus, RRI West was on both sides of the FMW RRI to Opco lease.

---

[152] Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; 33:25–34:6.
[153] Doc. Nos. 95-1 at 9.
[154] Ex. 9, Defendants' 30(b)(6) Dep. 34:8–14.
[155] Doc. Nos. 94-1 at 4–5; Doc. Nos. 95-1 at 4–5; Doc. Nos. 96-1 at 4–5.
[156] Ex. 30, Lease Agreement Between FMW RRI and Opco.

████████████████████ [157] These agreements show that RRI West and FMW RRI aren't separate legal entities.

Given the evidence that RRI Inc. and RRI West aren't separate legal entities and given the evidence that RRI West and FMW RRI aren't separate legal entities, a jury could reasonably conclude that Defendants are separate in name only, the arbitrary distinctions between each are invalid, and the actions of one Defendant should be treated as the actions of all Defendants.

On top of this evidence supporting the sameness of Defendants, the record also supports the inference that RRI West worked on behalf of RRI Inc. Defendants outlined the relationships between the *five* Red Roof entities involved in running the Red Roof Inn in a chart at their 30(b)(6) deposition.[158] That chart shows that RRI Inc. had an "employment agreement" with RRI West.[159] Defendants could not, however, produce that agreement. But based on Defendants' chart, a reasonable inference is that there was an employment agreement between these two companies, since someone working for Defendants thought that there was an employment

---

[157] Ex. 31, Management Agreement Between Opco and RRI West.

[158] The two nonparty Red Roof entities are FMW RRI Opco LLC and Red Roof Inn Franchising, LLC. Tellingly, nothing about Defendants' arguments against TVPRA liability suggests that H.B. could recover had she sued these two nonparties. In other words, Defendants aren't saying that H.B. sued the wrong hotel entities and that's why she can't recover. They are saying that she cannot recover *from any entity connected to the hotel's operation* under the TVPRA.

[159] Ex. 32, Relationships Between RRI Entities (Simplified), Ex. 9, Defendants' 30(b)(6) Depo.

agreement or else it wouldn't have appeared on the chart. Another reasonable inference is that RRI West's work—managing, supervising, hiring, and training—at the Red Roof Inn was on RRI Inc.'s behalf.

Based on these disputed material facts and the inferences drawn therefrom, H.B. can establish vicarious liability against Defendants under the TVPRA— whether under a theory of veil piercing or agency (or both).

***Veil Piercing.*** Under federal common law, whether an alter-ego relationship exists and veil piercing is appropriate depends on the totality of the circumstances. *United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.*, 855 F.2d 1499, 1506 (11th Cir. 1988). Alter-ego liability requires "control or domination of a corporation by an individual or a corporate entity" as well as "the use of corporate fiction." *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157, 1161 n.6 (5th Cir. Unit A Sept. 1981) (citation omitted). And alter-ego liability generally requires proof of three elements: (1) "control, not mere majority or complete stock control, but complete domination"; (2) that "control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights"; and (3) that "control and breach of duty must proximately cause the injury." *United Steelworkers*, 855 F.3d at 1507 (citation omitted).

But these elements are not absolute. Under federal common law, "the

corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy." *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703, 713 (1974). For this reason, "federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law of alter ego." *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir. 1981), *cited with approval by Ala. Power Co. v. Tenn. Valley Auth.*, 948 F. Supp. 1010, 1026 (N.D. Ala. 1996) and *MCI Telecomm. Corp. v. O'Brien Marketing, Inc.*, 913 F. Supp. 1536, 1541 (S.D. Fla. 1995). Indeed, the former Fifth Circuit agreed that "[t]he corporate veil should always be pierced 'when the theory of separate entity leads to an absurdity or persons involved in a corporation seek to use the legal fiction to immunize them from the consequences of their fraud or illegal actions,' or to prevent injustice to third parties, or where one corporation becomes the conduit of another." *Talen's Landing*, 656 F.2d at 1161 n.6 (citations omitted).[160]

Section 1595(a) is remedial in nature and entitled to broad interpretation. *See Peyton v. Rowe*, 391 U.S. 54, 65 (1968) (applying "canon of construction that

---

[160] To determine that FMW RRI is the alter ego of RRI West, one need look no further than Defendants' own admissions. ███████████████████████████████ ███████████████████████████ Ex. 9, Defendants' 30(b)(6) Dep. 23:25–24:6; 33:25–34:6; 34:23–35:1. Allowing both to evade responsibility for illegal actions by pointing to the other is an injustice to H.B.

remedial statutes should be liberally construed"). The statute gives sex-trafficking victims a right to compensation for the harms of being trafficked. As a result, federal courts should give less respect to the corporate form in applying this statute than the "strict common law of alter ego" does. *Town of Brookline*, 667 F.2d at 221. For it would be unjust and contravene the public policy of § 1595(a) to allow the owners, operators, and beneficiaries of a hotel where it was known or should have been known that the victim was being sex trafficked to avoid all civil liability because they ran the hotel via a labyrinth of interrelated legal entities.

As discussed above, the record contains more than enough evidence to support piercing the corporate veil between Defendants. That is especially true were the Court to conclude that H.B.'s direct-liability claims against Defendants could not, as a matter of law, survive summary judgment.

***Agency.*** The existence of an agency relationship is a question of fact. *See Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1235–36 (11th Cir. 2014) (collecting cases). Under the Eleventh Circuit's "unambiguous precedent, an agency relationship requires: '(1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent.'" *Id.* at 1236 (quoting *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003)).

Here, the record evidence creates a jury question about whether RRI West was

RRI Inc.'s agent. After all, the fact that Defendants believed that an employment agreement existed between RRI Inc. and RRI West shows that RRI Inc. wanted RRI West to work on its behalf. RRI West manifested its acceptance of the undertaking by indisputably managing the day-to-day operations of the hotel. Finally, the fact that RRI Inc.'s president was also the "top guy" at RRI West shows that RRI Inc. exercised control over RRI West's performance. There are sufficient disputed facts regarding each Defendant's vicarious liability to preclude summary judgment.

> ### ii. Defendants' employees were acting within the course and scope of their employment, even when acting illegally.

Defendants' employees were following Red Roof's own (albeit illegal) policies and making Defendants money when they assisted commercial sex operations at the Red Roof Inn generally and H.B.'s trafficker specifically.

For actions to be within the scope of employment, the employee must (i) "perform[] work assigned by the employer," or (ii) "engag[e] in a course of conduct subject to the employer's control." Restatement (Third) of Agency § 7.07(2).[161] The

---

[161] The Eleventh Circuit has long held that "[w]hen applying agency principles to federal statutes, 'the Restatement [ ] of Agency . . . is a useful beginning point for a discussion of general agency principles.'" *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1308 (11th Cir. 2017) (alterations in original) (quoting *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1245 (11th Cir. 2002)). Indeed, the Eleventh Circuit has relied on the Restatement (Third) of Agency in cases applying federal common law to scope of employment questions. *See, e.g.*, *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1167–68 (11th Cir. 2021) ("Common law . . . allows an employer

employee's *sole* motivation need not be to serve the employer; rather, the employee's motivation need be only to serve *some* purpose furthering the employer's business. *See, e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) ("The law now imposes liability where the employee's purpose, however misguided, is wholly or in part to further the [employer]'s business." (internal citations omitted)); *Genzmer v. Public Health Tr. of Miami-Dade Cnty.*, 219 F. Supp. 2d 1275, 1281 n.7 (S.D. Fla. 2002) (finding no "cases where courts have required a showing greater than partial motivation by an employee to serve an employer").

Illegal activity is not *per se* outside the scope of employment as Defendants state (with no legal support). *See, e.g.,* Doc. No. 94-1 at 18–19. Instead, "[t]he mere fact that an activity is illegal or inappropriate does not, without more, render that activity outside the scope of employment." *Microsoft Corp. v. Big Boy Distrib. LLC*, 589 F. Supp. 2d 1308, 1323 (S.D. Fla. 2008) (citing *McIntyre ex rel. Est. of McIntyre v. United States,* 545 F.3d 27 (1st Cir.2008) ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment.")).

In fact, illegal activity assisting sex traffickers at a hotel has been found to be

---

to be held liable for its employee's torts if committed during the scope of employment." (citing Restatement (Third) of Agency § 7.07)). Courts outside the circuit have applied the Restatement (Third) of Agency to TVPRA claims. *See, e.g.*, *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 939–40 (D. Or. 2020) (weighing factors in Restatement (Third) of Agency to determine whether principal–agent relationship existed between hotel properties and defendants).

within the scope of employment. In *Bhimani*, a hotel company, Om Sri, Inc., was *convicted* of a sex trafficking conspiracy because its employee "rented rooms to pimps for their victims and let them work first and then pay the hotel for the room with proceeds from commercial sex, that was directly within the scope of his duties and intended to benefit the company." *United States v. Bhimani*, 3:17-cr-324, 2021 WL 5179196, at *9 (M.D. Pa. Nov. 8, 2021). Om Sri's employees also did not kick guests out despite the criminal behavior and "allowed criminals to stay and work out of their room and pay the room rate with the proceeds." *Id.* Employees "continued to rent rooms to these guests, and the hotel received the financial benefit [by having its room occupied]." *Id.* (alteration in original).

Similarly, here, Defendants' employees rented rooms to H.B.'s trafficker and assisted the trafficker by acting as lookouts for the police, disposing of the condoms, and providing the inordinate number of towels necessary to clean H.B. so that she could be sold for sex as many as 15 times per day.[162] Red Roof's policy was to "sell the rooms" when employees suspected illegal commercial sex activity."[163] Heather Gilmore did just that for three years.[164] Even today, *in this case*, Defendants have maintained that they cannot refuse to rent a room when prostitution is suspected for

---

[162] Ex. 1, H.B. Dep.  38:24–39:13; 243:4–244:17; 245:21–246:4; 245:21–246:4; Ex. 2, H.B. Decl. ¶ 3–5.
[163] Ex. 4, Gilmore Dep. 22:1–7.
[164] Ex. 4, Gilmore Dep. 20:22–21:7; 21:9–19; 28:2–7.

the bewildering reason that that would be discrimination.[165] Given the evidence in this case that nine out of ten "prostitutes" are in fact sex trafficking victims,[166] Defendants *still* recklessly disregard the risk that their company policy of allowing "prostitution" in fact permits sex trafficking at their hotels.

In short, the fact that Defendants' employees' on-the-job conduct was illegal does not *ipso facto* make that conduct outside the scope of employment. Defendants' employees did the work Red Roof employed them to perform.[167] Instead, it shows that the operation of the hotel and the liability of Defendants could be criminal as well as civil. Because there are disputed facts showing the Red Roof Inn had (and still has) a policy permitting illegal commercial sex, and its employees directly assisted H.B.'s trafficker, a jury must determine whether Defendants' employees acted within the scope of employment.

### D.   Defendants' other arguments are wrong.

### i.        Defendants *did* participate in a sex trafficking venture with Plaintiff's traffickers.

---

[165] Ex. 9, Defendants' 30(b)(6) Dep. 155:6–8.

[166] Ex. 7, Doherty Decl. ¶ 4; ¶ 7.

[167] While Defendants' scope-of-employment claim focuses solely on the hotel staff taking money to be lookouts, there are numerous other actions of Defendants' employees that give rise to liability that Defendants do not challenge. For example, hotel maintenance's bringing of fresh towels to the room where H.B. was trafficked multiple times a day; observing the signs of H.B.'s sex trafficking; creating a place where H.B.'s traffickers were unbothered for trafficking; establishing a policy of allowing illegal commercial sex at the hotel; or renting rooms multiple times to H.B.'s sex traffickers.

Even though the TVPRA does not require Defendants to participate in a "sex trafficking venture" with Plaintiff's trafficker, *see supra,* section III.A.ii., that is exactly what the Defendants did. For years, Defendants ran a hotel that explicitly permitted commercial sex and other crimes,[168] and hotel staff offered these services and more to Plaintiff's trafficker.[169] Defendants' employees acted as lookouts for Plaintiff's trafficker and kept the room stocked with additional towels and free of used condoms.[170] H.B. saw the housekeepers come to her room multiple times a day to deliver extra towels to her trafficker.[171] That *is* participating in a sex trafficking venture with Plaintiff's trafficker. *Does 1–4*, 2023 WL 5444261, at *3; *W.K.,* 2023 WL 6290523, at *10.

The illegal nature of the activity does not change the fact that this was part of the job at the Red Roof Inn. *Supra* section III.C.ii. Heather Gilmore allowed commercial sex activity at the hotel for three years while she worked there because it was the hotel's policy to "sell the rooms."[172] Being a company instead of a person does not prevent liability for employees' criminal conduct; a hotel can be just as criminal as its employees. *See Bhimani*, 2021 WL 5179196, at *9.

---

[168] Ex. 4, Gilmore Dep. 20:22–21:5; 21:9–19; 21:21–24; 28:2–7; Ex. 1, H.B. Dep. 243:4–11; 243:4–244:17; 245:21–246:4; Ex. 2, H.B. Decl. ¶¶ 3–5.

[169] *Id*.

[170] Ex. 1, HB Dep. and Declaration.

[171] Ex. 1, HB Dep.

[172] Ex. 1, HG Dep. Check quote.

This evidence does not depend on impermissible hearsay. *First,* H.B. saw her trafficker pay the front desk employee and can infer from that payment outside the front office that its purpose was to further her trafficker's illicit activity.[173] *Second,* H.B. saw the unusual frequency of housekeeping to her room to deliver their needed towels and dispose of condoms and saw that the housekeepers also were afraid of her traffickers.[174] A jury may infer that this strange behavior was intended to further the trafficker's business at the hotel. Thus, evidence of Defendants' agents' direct involvement in H.B.'s trafficking is admissible.

*Third,* H.B.'s trafficker told her what those payments were for. As noted above, the staff—acting on behalf of Defendants in the course and scope of their employment—allowed commercial sex and aided H.B.'s traffickers in trafficking H.B. *Supra* at 17–19 and section III.C.ii. That makes Defendants co-conspirators with Plaintiff's traffickers, and co-conspirator statements made "during and in furtherance of the conspiracy" are not hearsay. Fed. R. Evid. 801(d)(2)(E).

A conspiracy for hearsay purposes is much broader than criminal conspiracy.

[C]onspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law." Just as coconspirators are generally considered partners in crime and therefore agents of each other, joint venturers may be considered partners in the joint undertaking. Indeed, Rule 801(d)(2)(E) has been recognized to apply not only in criminal cases but also in civil cases

---

[173] Ex. 1, H.B. Dep. 243:4–11; 244:5–15.
[174] Ex. 2, H.B. Decl. ¶¶ 3–6

where "there may be no criminal conspiracy or unlawful actions involved. *United States v. El-Mezain*, 664 F.3d 467, 503 (5th Cir. 2011), *as revised* (Dec. 27, 2011) (quoting *U.S. v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983)). The rule applies "when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are . . . admissible against the others, if made in furtherance of the common goal." *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) (quoting *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983)).

Defendants and their agents acted in concert with Plaintiff's trafficker with the common goal of profiting from H.B.'s trafficking because the hotel allowed commercial sex operations and "the widespread commission of sex crimes created a market and beds for sex traffickers to operate." *Tucker Inn Inc.*, 2023 WL 6538391, at *5. Further, at least two of Defendants' employees were paid extra by the trafficker to provide lookout services while he rented rooms at Defendants' hotel.[175] The longer the hotel assisted H.B.'s trafficker in avoiding the police while selling H.B. for sex, the more money both the trafficker and Defendants made. Because there is evidence Defendants were co-conspirators with H.B.'s trafficker, Lucky's statements to H.B. are not hearsay. Fed. R. Evid. 801(d)(2)(E).[176]

---

[175] Ex. 1, H.B. Dep. 243:4–244:17; 245:21–246:4.

[176] The statements would also be admissible to show their effect on H.B., i.e., she did not ask for help from hotel employees because her trafficker told her they were helping him traffic her. Fed. R. Evid. 801(c).

ii.        **Defendants wrongly import the criminal standards of the TVPRA into H.B.'s civil case, which the Eleventh Circuit has rejected because it "makes no sense."**

Throughout their briefs, Defendants rehash the same arguments the Eleventh Circuit expressly rejected in *Doe #1*. Over and over, Defendants imply or just wrongly state that a beneficiary claim such as Plaintiff's requires participants to "knowingly participate" in a venture with sex traffickers, a "reckless" or intentional standard that applies only to the "most direct actors in the trafficking venture." *See, e.g.,* Doc. No. 94-1 at 10; 16–17. This is the exact interpretation the Eleventh Circuit held "make[s] no sense[.]" *Doe #1*, 21 F.4th at 724. "If we replace "participation in a venture" with Section 1591(e)(4)'s "knowingly assisting, supporting, or facilitating a violation of sub-section (a)(1)," we get a nonsense sentence." *Id.*

Defendants, however, disagree. They claim that TVPRA's "use of language requiring 'knowing participation,' which the Eleventh Circuit has interpreted to mean that the actor must 'take part in' or 'share in,' shows an intent to limit liability to parties who effected the trafficking operations."[177] Defendants are wrong. *For starters*, Defendants quote the words "knowing participation" as a requirement of the TVPRA as if that phrase were found somewhere in the *Doe #1* opinion.[178] That

---

[177] Doc. 94-1 at 17 (quoting *Doe #1*, 21 F.4th at 725).
[178] *See, e.g.,* Doc. No. 94-1 at 17.

phrase is *not* found in the *Doe #1* opinion or in the TVPRA at all and is yet another attempt to import the criminal requirements of 18 U.S.C. § 1591 into a beneficiary claim under § 1595.

Section 1595(a) does not require "knowing participation." Instead, subsection (a) applies to a beneficiary who "***knowingly benefits***, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." The participation prong of the claim may not be twisted to raise the knowledge standard beyond Congress's intended floor of constructive knowledge. *Doe #1*, 21 F.4th at 724.

### iii.        Red Roof's ignorance of the law is irrelevant.

RRI Inc. and RRI West argue they lacked the requisite knowledge of H.B.'s trafficking at the Red Roof Inn because they were "unaware of sex trafficking" as a concept at that time. However, this argument is nullified by both law and fact. *First*, Plaintiff need not prove Defendants' actual knowledge. The relevant question under § 1595(a) is whether Defendants knew or *should have known* that minors were having (or would be caused to have) commercial sex at the Red Roof Inn in 2011 and 2012. It belies all reason to think that in 2012, Red Roof, a national hotel chain, was unfamiliar with sex trafficking—a federal crime since 2000. And Defendants' have testified they knew some signs of sex trafficking and prostitution were the same

*in 2010.*[179] But even assuming Red Roof did lack such knowledge, it is fundamental that "ignorance of the law is no defense." *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563 (1971) (noting that use of "knowingly" in a statute does not require affirmative knowledge of the law). Defendants' "[d]eliberate ignorance cannot become a safe harbor for [their] culpable conduct." *Bhimani*, 2021 WL 5179196, at *7 (citing *United States v. Wert-Ruiz*, 228 F.3d 250, 258 (3d Cir. 2000) (denying relief to hotel criminally convicted of sex trafficking crimes).

## **CONCLUSION**

Because there are disputed issues of fact as to each element of H.B.'s claims, Defendants' motions for summary judgment should be denied.

Respectfully submitted this 19th day of October, 2023.

**ANDERSEN, TATE, AND CARR, P.C.**

**/s/ Jonathan S. Tonge**
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097

---

[179] Ex. 12, Stocker W.K. 30(b)(6) Dep. 36:25–39:15.

(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## RULE 7.1(D) CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D) of the United States District Court of the Northern District of Georgia, the undersigned certifies that the foregoing submission to the Court was computer-processed, double-spaced between lines, and used Times New Roman font of 14-point size.

Respectfully submitted this 19th day of October, 2023.

**ANDERSEN, TATE, AND CARR, P.C.**

**_/s/ Jonathan S. Tonge_**
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

H.B.,                                          :
                                               :
    Plaintiff,                           :
                                               :          CIVIL ACTION FILE NO.
    v.                                   :          1:22-cv-01181-JPB
                                               :
RED ROOF INNS, INC. et al.,                    :
                                               :
    Defendants.                          :

## CERTIFICATE OF SERVICE

This is to certify that I have this day presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system, which will send notice to counsel of record.

Respectfully submitted this 19th day of October, 2023.

**ANDERSEN, TATE, AND CARR, P.C.**

**_/s/ Jonathan S. Tonge_**
Patrick J. McDonough
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
*Attorneys for Plaintiff*

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone

(770) 822-9680 | Facsimile
(770) 822-9680 | Facsimile